UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JASON STONE,

                Petitioner,                                  Hon. Wendell A. Miles

v.                                               Case No. 1:05-CV-691

HUGH WOLFENBARGER,

                Respondent.

_____/


**REPORT AND RECOMMENDATION**

This matter is before the Court on Stone's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Stone's petition be **denied**.


**BACKGROUND**

As a result of an incident which occurred on or about July 7, 2002, Petitioner was charged with first degree criminal sexual conduct and assault with intent to do great bodily harm less than murder. (Trial Transcript, Oct. 21, 2002, 6). Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

1

**Jason Shipman**

As of July 8, 2002, Shipman was employed as a deputy with the Eaton County Sheriff's Department. (Tr. 119-20). At approximately 4:50 a.m. that morning, Shipman was dispatched "to an emergency call where a female was calling for help." (Tr. 120-22). Upon arriving at the subject residence, Shipman approached the house and "pounded" on the door, announcing that he was with the Sheriff's Department. (Tr. 122). Nobody answered the door, at which point Shipman began "to go around the house" in an attempt "to figure out what was going on." (Tr. 122).

Immediately thereafter, Shipman "heard a female screaming." (Tr. 122). He then heard a male voice declare, "it was all over for her." (Tr. 122-24). The woman "pleaded no, please no," in response to which the man stated, "I ain't done yet." (Tr. 124). Shipman testified that he had listened to the 911 call resulting in his dispatch to this residence. (Tr. 124). According to Shipman, the voices on the 911 call were the same voices that he heard inside the house. (Tr. 124).

Believing that somebody was in "grave danger," Shipman kicked in the front door and entered the residence. (Tr. 126-27). Shipman entered the bedroom where he found Petitioner and Deasha Stone in a closet. (Tr. 127-30, 137-42). Petitioner was standing over Stone, who was "cowering in the corner and sobbing." (Tr. 130). In the corner of the closet in which Stone was cowering, the drywall was "cracked and dented." (Tr. 130). Petitioner was immediately arrested. (Tr. 130-31). Shipman observed that Deasha Stone had suffered numerous facial injuries. (Tr. 131). After receiving medical treatment from emergency medical technicians, Deasha Stone provided Shipman with a statement. (Tr. 132). Stone's statement reads as follows:

> I was sleeping in my daughter's room and Jason came back home.
> He woke me up and said, "I want to talk." I said I didn't want to talk.
> I was sitting in the bed and he took his mouth and bit me on my left
> cheek. Then he put his fingers on my throat and eyes and mouth. He

2

threw me in the closet and strangled me with both hands.  I was naked because I took a shower before I went to bed.

When I was on the floor in the closet he said, have you been fucking, let me feel.  Then he stuck his fingers inside my vagina and began poking and pushing my insides.  I said no, please don't hurt me, don't put your fingers in me, it hurts so bad.

He hit me with his fist in the face over and over for about an hour. When the police came in he was beating my head against the wall.

(Tr. 134).


**Scott Brooks**

As of July 8, 2002, Brooks was employed as a deputy with the Eaton County Sheriff's Department.  (Tr. 139-40).  Sometime early that morning Brooks was dispatched to investigate a possible domestic assault.  (Tr. 139-40).  Brooks arrived at the residence just before Deputy Shipman kicked in the front door.  (Tr. 140).  Brooks and Shipman entered the residence "at approximately the same time."  (Tr. 140).  Given the amount of "screaming and yelling," Brooks believed that somebody's life "was seriously in jeopardy."  (Tr. 141).  Upon entering the bedroom, Brooks observed Petitioner "standing over" a woman, who was "crouched down" in the back corner of the closet.  (Tr. 140-41).

After helping secure Petitioner, Brooks escorted him from the residence.  (Tr. 141). As the pair walked towards Brooks' vehicle, Petitioner repeatedly told Brooks that he "didn't know the whole story" and that "his wife was cheating on him."  (Tr. 142).  Petitioner then "claimed he was having an asthma attack."  (Tr. 142).  Petitioner was subsequently transported to a local hospital.  (Tr. 142-43).  At the hospital, Deputy Brooks read Petitioner his Miranda rights, after which Petitioner agreed to make a statement.  (Tr. 143).  Petitioner told Brooks that he had returned

3

to the residence that morning, after which he and Deasha Stone "had gotten in a screaming and yelling match." (Tr. 143). According to Petitioner, Stone "had walked into the closet on her own free will." (Tr. 143). Petitioner admitted that he had screamed at Stone and used "vulgarities," but denied hitting her or touching her in an inappropriate manner. (Tr. 143-44). Petitioner claimed that he yelled at Stone "because she was lying." (Tr. 144).

After being transported to the Eaton County Jail, Petitioner provided a written statement, which reads as follows (as testified to by Deputy Brooks):

> My wife came back from vacation, a vacation in which she was seen other men, this hurt me no doubt, but everything started after I checked our voice mail and he had left her a message. I can't read what this word is. It continues went on before - - apparently this has gone on before but none as heated as this. I called the police and the first exchange they came and since I hadn't touched her or her me they said there was nothing they could do. After the police left she called the guy and some girl, I believe her friend - - believe Rhonda but I can't really make out the name - - exact words from her mouth was no, they didn't take her bitch ass husband to jail. He got to touch me first. But I got their names, I'll get them. At this point we had a mirror image and I left to go, it says get some I'm not sure what the last word in that paragraph is.
>
> I returned sometime after 4:00 a.m., my wife and my son was in the little girl's bedroom. I came in and I believe it says asked can we talk for a moment. And she followed me into our room. After we got to our room I asked her about the other men and about her letting them around the children so soon. At that point I believe it says the conversation and yelling began back and forth, the basic fuck you, fuck you conversation.
>
> Then went into the closet and I followed. She sat at the back of the closet and I got in front of her and yelled all of my bad feelings about the situation at her. We were both heated, both full of, I can't make some of this out, but yet at no point did I touch her in any way. I never hit her but we had a million I'm going to make you feel bad, you make me feel bad, exchange of words.
>
> I'm sure my words hurt Deasha and for that I'm sorry but again I did

in no way touch her.  Why would I, I can't make out that word, of what the problem is, begged her to take me back.

Deasha wants me out of our home and will do anything to seek out this mission.  All of this is clear to see.

Thank you.

(Tr. 144-47).


**Deasha Stone**

Stone testified that prior to the encounter that resulted in Petitioner's arrest, she had telephoned 911 earlier that evening.  (Tr. 151).  According to Stone, she called 911 because Petitioner "threw the phone and the answering machine on the floor, he was locking me off in the kitchen and wouldn't let me get through, so I called the cops."  (Tr. 152).  The police eventually arrived, but nobody was arrested.  (Tr. 152).  After the police departed, Stone entered her bedroom closet and "sat up against the back of the door" and then "called some friends and talked on the phone until [Petitioner] left."  (Tr. 152-53).  Petitioner departed the residence between midnight and 1:00 a.m.  (Tr. 153).

According to Stone, Petitioner later reentered the residence through a window and entered her daughter's room (where she was sleeping).  (Tr. 150, 153-54).  Stone testified that Petitioner "smelled like a lot of alcohol."  (Tr. 154).  Petitioner asked Stone to "talk to him to try to make it work."  (Tr. 150, 154).  Stone told Petitioner that she "wasn't interested."  (Tr. 150, 154).  Petitioner began getting louder and louder, however.  (Tr. 150, 154-55).  Stone eventually agreed to accompany Petitioner to their bedroom "because [she] didn't want him to wake up [their] son."  (Tr. 150, 155).

5

After entering the bedroom, Stone sat on the edge of the bed.  (Tr. 155).  Petitioner again asked Stone if she would "make it work."  (Tr. 150, 155).  Stone "said no," to which Petitioner responded, "fuck you, then."  (Tr. 155).  After repeating this several times, Stone asked Petitioner "how would you expect me to take you back and forgive you if you're telling me to fuck you, fuck it."  (Tr. 155).  Petitioner then "laid across" Stone and "bit" her.  (Tr. 150, 155-56).  Petitioner pulled Stone's hair and repeatedly banged her head against the wall.  (Tr. 150, 156-60).  Petitioner choked Stone and bit her several times.  (Tr. 150).  According to Stone, Petitioner also "put his hand and he shoved it up inside of me and he kept poking me and then he lifted me up with it."  (Tr. 150, 160-61).  Stone told Petitioner to stop because he was hurting her.  (Tr. 150).  At some point during the encounter, Stone's son "came out of his room" and "jumped on" Stone and "hugged" her.  (Tr. 151).  Petitioner then "ran to put him in his bed," at which point Stone "dialed 911" and just left the telephone "off the hook."  (Tr. 151, 156).  Stone testified that she called 911 because she thought Petitioner was going to kill her.  (Tr. 151).

**Jim West**

As of July 8, 2002, West was employed as a detective with the Eaton County Sheriff's Department.  (Tr. 165-66).  On that date, West interviewed Petitioner.  (Tr. 166-68).  The tape of this interview was played for the jury.  (Tr. 169, 175-76).  The record, however, does not appear to contain a transcript of this interview.

6

**Dr. Kory Deason**

As of July 8, 2002, Dr. Deason was working as a physician in the emergency department of the Hayes Green Beach Hospital. (Tr. 169-70). Dr. Deason examined Deasha Stone that morning. (Tr. 170). Stone reported that she was experiencing "pain in her head and neck and eyes and that she had been assaulted." (Tr. 170). Specifically, Stone reported that "she was assaulted by her husband in the morning, that he had struck her head against the floor and a shoe rack, had bit her on the forehead and the face, and choked her with his hands, hit her with his fists, stuck his fingers in her eyes and the vagina." (Tr. 172). Dr. Deason performed an examination of Stone, the results of which revealed various "soft tissue injuries" and redness of the eyes. (Tr. 172-73). A vaginal examination revealed no evidence of injury. (Tr. 172). Dr. Deason concluded that the results of his examination were "consistent" with Stone's account of events. (Tr. 175).

**Adam Morris**

Morris testified that he had been employed as a deputy with the Eaton County Sheriff's Department for five years. (Trial Transcript, Oct. 22, 2002, 17-18). Morris testified that at some point during the summer of 2002, he was dispatched to Petitioner's residence to investigate "a domestic dispute" between Petitioner and his wife. (Tr. 18). Morris testified that the dispute had been "verbal only" and that no arrests were made. (Tr. 19). In an attempt to "defuse the situation," Morris "suggested" to Petitioner "that he leave." (Tr. 20). Petitioner declined Deputy Morris' suggestion. (Tr. 20).

**Dorothy Stone**

Dorothy Stone is Petitioner's mother.  (Tr. 21).  Stone testified that she had spoken with her son and Deasha Stone about the events of July 8, 2002.  (Tr. 22).  Deasha Stone told Petitioner's mother that "they had been in a fight," but she did not provide any details.  (Tr. 22). Petitioner told his mother that "they had been in a fight and they both was, you know, very angry at one another, and that's about it."  (Tr. 23).

**Rodney DeMyers**

DeMyers testified that he met Deasha Stone in approximately 1994 and married her in 1997.  (Tr. 24).  He was married to Stone for approximately two years.  (Tr. 25).  The following exchange then occurred:

> Q:   And during your relationship with Deasha Stone were
>       you able to form an opinion as to her truthfulness?
>
> A:   Yes.
>
> Q:   What was that?
>
> A:   I'm afraid of her.
>
> Q:   What about her truthfulness?
>
> A:   She's not very truthful.

(Tr. 26).

**Darryl Morris**

Morris testified that he had been friends with Petitioner "for about three or four

years." (Tr. 27). In the spring of 2002, Morris visited with Petitioner "every weekend." (Tr. 27). Morris and Petitioner would "hang out, maybe go to a bar or something." (Tr. 27-28). According to Morris, Petitioner would talk about his relationship with his wife, "but he wasn't, you know, going nuts about it." (Tr. 28).

At "some point" that spring, there was a "big fight" between Petitioner and his wife, to which the police responded. (Tr. 28-29). After this fight, Petitioner drove to Morris' residence where the two began drinking alcohol. (Tr. 29). Morris and Petitioner then "rode around, drank, [and] talked." (Tr. 29). Petitioner eventually drove back to his residence. (Tr. 29-30). Morris remained in the car and listened to the car stereo. (Tr. 30). Morris had the car stereo turned up "pretty loud" and was, therefore, unable to hear what transpired in the residence between Petitioner and Deasha Stone. (Tr. 30-32). Morris was still in the car listening to the stereo when the police arrived. (Tr. 30). About ten minutes later, an ambulance arrived. (Tr. 30-31).

**Blaine Fitzhugh**

Fitzhugh testified that he had known Petitioner for "about a year and a half." (Tr. 34). Fitzhugh and Petitioner "used to discuss family things, barbecue outside once in a while, go for bike rides." (Tr. 34). The two also talked about their personal lives. (Tr. 34-35). In this respect, Fitzhugh understood that Petitioner "had a troubled marriage." (Tr. 35). Fitzhugh occasionally visited Petitioner's residence. (Tr. 35). Fitzhugh discerned "tension" between Petitioner and his wife, but no "shouting" or "nasty language." (Tr. 35).

On July 7, 2002, Petitioner telephoned Fitzhugh. (Tr. 39-40). Petitioner "seemed kind of disturbed" so Fitzhugh "proceeded to go over to his house and talk to him." (Tr. 40).

Fitzhugh advised Petitioner to "go for a ride, go visit a family member." (Tr. 40-42). Petitioner accepted Fitzhugh's advice and departed the residence. (Tr. 41-42). During this visit, Fitzhugh observed no violence between Petitioner and his wife. (Tr. 41).

**Jason Stone**

Petitioner testified that approximately two or three weeks prior to July 8, 2002, he and Deasha Stone decided "we was going to break up and I was going to move out of the house." (Tr. 53). According to Petitioner, when he began to move out Deasha told him, "no, I don't want it to be like that, we can stay together but we'll do other things." (Tr. 53). Deasha further told Petitioner that "we can still screw, we still can do the family thing for the kids, but we ain't going to consider it ourself all the way together." (Tr. 53).

After he and his wife returned home on the evening of July 7, 2002, Petitioner listened to their answering machine. (Tr. 54). According to Petitioner, there was a message on the machine from "a guy" who was asking about his wife and kids. (Tr. 54). Petitioner thought this message was left by his wife's boyfriend. (Tr. 54). Petitioner confronted his wife about this matter and an argument ensued. (Tr. 54-55). Deasha Stone subsequently telephoned 911 and a couple of deputies responded, one of whom was Deputy Adam Morris. (Tr. 55).

Deputy Morris told Petitioner that "maybe you should just get in your car and go," in response to which Petitioner responded, "I'm not leaving my house." (Tr. 55). According to Petitioner, Deputy Morris then stated, "you know, she's real upset and if she was to say that you hit her, I would have to take you to jail, and it seems like that's where it's going." (Tr. 56). Petitioner eventually departed the residence and drove to Darryl Morris' residence. (Tr. 56-57). Petitioner and

10

Morris then rode around in Petitioner's car for "a few hours." (Tr. 59-60). Petitioner then returned to his residence. (Tr. 59-60).

Morris remained in the car, but Petitioner crawled into his residence through a window. (Tr. 60). According to Petitioner, he was forced to climb through a window because Deasha took away his house key. (Tr. 60-61). Petitioner found Deasha and said "can we talk now?" (Tr. 61-62). Deasha then "followed" him into another room. (Tr. 62). According to Petitioner, their conversation "was going okay, until I mentioned the guy that I seen her with." (Tr. 63). Petitioner testified that he "was angry about all the guys that she was dealing with." (Tr. 63). Petitioner and Deasha then began arguing. (Tr. 63). According to Petitioner, the argument quickly moved to the closet. (Tr. 63). With respect to how the argument migrated to the closet, Petitioner offered the following testimony:

> Yeah. We ended up in the closet. Now the closet, you know, when she went into the closet she went to lay back like there's a spot in the closet - we always go to our closet. I go to the closet if I need to pray, if you stress out. There's something about the closet, I don't know. It's a big closet, we just go in there and chill.

(Tr. 63-64).

Petitioner testified that Deasha entered the closet on her own and that no violence occurred until after they were in the closet. (Tr. 64). With respect to what happened after he and Deasha entered the closet, Petitioner testified:

> Yeah, we was standing face-to-face. And this is what I'm not sure of, I'm not sure if we was like right in front of the closet at this time or in the closet, but we was standing face-to-face and we was talking about the kids and Deasha was like, I did this, I did that, you know what I'm saying, this is how I did it, and she was referring to her sexual encounters with the dude. And when she did that, I slapped her. It was like, the last thing she said before and if I'm going to fuck somebody, my kids can be around it, you ain't got nothing to say or

11

do with what I tell my kids.  And stuff like that.

(Tr. 64-65).

        After slapping Deasha, she "laid down in the corner" of the closet and began crying.

(Tr. 65).  Petitioner testified that he did not recall how many times he slapped his wife.  (Tr. 66).

Petitioner did not recall whether he bit Deasha.  (Tr. 65-66).  Petitioner acknowledged that he "lost

control," but asserted that he never hit Deasha with his fist.  (Tr. 65-66).  According to Petitioner,

he "did a lot more talking than I did putting my hands on her."  (Tr. 66).  However, Petitioner also

testified that he "had a buzz" that "keeps me from remembering."  (Tr. 67).  When asked whether

he put his fingers inside Deasha's vagina, Petitioner testified:

> I believe that, you know - - I can't really say, man, I don't know what
> was the extent.  I know I didn't put my hand in there as said.

(Tr. 67).

        When asked about the holes in the walls of his residence, Petitioner acknowledged,

"yes, there's a lot of holes in my walls."  (Tr. 69).  Petitioner asserted, however, that he never hit his

wife's head against the wall.  (Tr. 69).  Petitioner testified that he punched the holes in the walls with

his fist.  (Tr. 69).  When asked whether he was trying to scare his wife by punching holes in the wall,

Petitioner testified, "no, I wasn't trying to scare her, I was making sure that I didn't hurt her."  (Tr.

70).

        On cross-examination, Petitioner was questioned as to whether he penetrated

Deasha's vagina, as evidenced by the following exchange:

> Q:     Did you put your fingers up inside her vagina?
>
> A:     I'm telling you that I do not know the extent of what
>         I - -

| | | |
|---|---|---|
| Q: | | I'm not asking you the extent.  The question is yes or no. |
| Counsel: | | Your Honor, I object, it's not the question - - |
| Petitioner: | | The question isn't a yes or no because I just don't know, I was drinking and I did not put - - I did not know exactly how far or what I did as far as putting my finger on her cake.  I believe that I might have touched her cake but I don't believe that I probed through her cake.  I don't believe my hand went into her cake. |

(Tr. 73-74).

Following a jury trial, Petitioner was convicted of first degree criminal sexual conduct.  (Tr. 119).  Petitioner was acquitted of the charge of assault with the intent to do great bodily harm less than murder, but was found guilty of the lesser crime of domestic assault.  (Tr. 119).  With respect to the domestic assault conviction, Petitioner was sentenced to time served. (Sentencing Transcript, December 27, 2002, 34).  As for the first degree criminal sexual conduct conviction, Petitioner was sentenced to 15-25 years in prison.  (Tr. 34).  Petitioner appealed his conviction to the Michigan Court of Appeals asserting the following claims:

I.    The prosecutor failed to introduce sufficient evidence to support the charge of assault with intent to commit great bodily harm.  The trial court erred where it denied Mr. Stone's motion for directed verdict on this count.  Mr. Stone was denied his constitutional right to due process and a fair trial.  The conviction should be reversed.

II.   Mr. Stone made two, unequivocal requests that the court replace his trial attorney.  The trial court erred where it denied Mr. Stone's requests for a new attorney.

13

III. Trial counsel failed to cross-examine the complainant about similar, false accusations that she made against her first husband. Counsel provided ineffective assistance of counsel. The conviction should be reversed.

IV. The probation department correctly scored zero points for offense variable 9 - terrorism/sadism. Mr. Stone did not take any action to humiliate the complainant. The trial court erred where it scored 50 points for offense variable 9. This decision significantly raised the guidelines. Mr. Stone is entitled to resentencing.

V. Defense counsel made statements during closing arguments that amounted to the functional equivalent of a guilty plea, and thereby failed to hold the prosecutor's case to a meaningful adversarial testing.

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Stone*, No. 246344, Opinion (Mich. Ct. App., April 22, 2004). Asserting the same claims, Petitioner then moved in the Michigan Supreme Court for leave to appeal. The court denied Petitioner's request, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Stone*, No. 126317, Order (Mich., Nov. 22, 2004).

On October 6, 2005, Petitioner submitted the present petition for writ of habeas corpus in which he asserts the following claims:

I. The writ should issue where Petitioner's right to due process was violated when the trial judge submitted the unwarranted and unsupported charge of assault with intent to do great bodily harm less than murder to the jury, with respect to this claim the state court findings are contrary to clearly established federal law.

II. The writ should issue where the trial judge failed to substitute trial counsel at Petitioner's behest especially where Petitioner made two unequivocal requests that established good cause for substitution,

14

with respect to this claim the state court findings manifest an unreasonable application of clearly established federal law.

III.    The writ should issue where Petitioner was denied the effective assistance of counsel where counsel failed to cross-examine the complainant about similar false accusations she made against her first husband, with respect to this claim the state court findings manifest an unreasonable application of clearly established federal law.

IV.    The writ should issue where Petitioner was denied the effective assistance of trial counsel where counsel made statements during closing arguments that amounted to the functional equivalent of a guilty plea, with respect to this claim the state court findings manifest an unreasonable application of clearly established federal law.

## STANDARD OF REVIEW

Stone's petition, filed October 6, 2005, is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

(d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

(2)    resulted in a decision that was based on an

15

> unreasonable determination of the facts in light of the
> evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also, Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively*

16

unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . .case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S. at 407).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority. The Court cannot look to lower federal court decisions in determining whether the relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law. *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct. *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)). Petitioner can rebut this presumption only by clear and convincing evidence. *Id.*

## ANALYSIS

### I.        Due Process Claim

As discussed above, one of the charges against Petitioner was that he committed assault with the intent to do great bodily harm less than murder. Petitioner was acquitted of this charge, but was instead convicted of the lesser charge of domestic assault. Petitioner claims that

there did not exist sufficient evidence to submit the charge of assault with the intent to do great bodily harm less than murder to the jury. While he was acquitted of this charge, Petitioner argues that the submission to the jury of the charge of assault with the intent to do great bodily harm less than murder charge resulted in an improper compromise verdict, thereby depriving him of the right to due process.

As discussed above, Petitioner is entitled to habeas relief only if he can establish that his conviction and incarceration violates clearly established federal law as articulated by the United States Supreme Court. The Supreme Court has clearly held that every criminal defendant has a right not to be convicted of a crime unless there exists evidence "sufficient to show beyond a reasonable doubt the existence of every fact necessary to constitute the crime charged." *In re Winship*, 397 U.S. 358, 363 (1970). As several courts have recognized, however, "the Supreme Court has never held that the submission of a charge, upon which there is insufficient evidence, violates a defendant's constitutional rights where the defendant is acquitted of that charge." *Thomas v. Bell*, 2008 WL 268892 at *5 (E.D. Mich., Jan. 29, 2008) (citations omitted); *Olivo v. Lafler*, 2007 WL 1747154 at *3 (E.D. Mich., June 18, 2007) (recognizing that "a number of cases have held that the submission to a jury of a criminal charge constitutes harmless error where the habeas petitioner is acquitted of that charge") (citations omitted); *Calderon-Hernandez v. Trombley*, 2007 WL 4181274 at *5 (E.D. Mich., Nov. 27, 2007) (same) (citations omitted).

Thus, Petitioner cannot establish that the submission to the jury of the charge of assault with the intent to commit great bodily harm less than murder violates clearly established law as articulated by the United States Supreme Court. Moreover, Petitioner's claim is premised upon the assertion that it was improper to submit this charge to the jury. The evidence presented at trial,

however, reveals that the trial court properly denied Petitioner's motion for directed verdict on this charge and instead submitted the matter to the jury.

Under Michigan law in effect as of the date Petitioner committed the acts for which he was convicted, the elements of assault with the intent to commit great bodily harm less than murder were: (1) an attempt or threat with force or violence to do corporal harm to another (an assault); and (2) an intent to do great bodily harm less than murder.  *See People v. Parcha*, 575 N.W.2d 316, 318 (Mich. Ct. App. 1997).  This is a specific intent crime, but "[t]he specific intent necessary to constitute the offense may be found in conduct as well as words."  *People v. Mack*, 317 N.W.2d 190, 193 (Mich. Ct. App. 1981).

Petitioner acknowledged that he assaulted his wife.  As for whether he did so with the requisite intent, Deputy Shipman testified that when he arrived at Petitioner's residence he heard Deasha Stone "screaming," immediately after which Petitioner stated that it was "all over" for her. Stone began pleading, "please no," to which Petitioner responded, "I ain't done yet."  Shipman believed that Stone was in "grave danger" and Deputy Brooks testified that given the amount of "screaming and yelling" emanating from Petitioner's residence, he believed that somebody's life "was seriously in jeopardy."  When deputies Shipman and Brooks discovered Petitioner he was standing over Stone, who was "cowering in the corner and sobbing."  The drywall in that particular corner of the closet was "cracked and dented," supporting Stone's testimony that Petitioner banged her head against the wall several times.  Stone also testified that Petitioner bit her and choked her and, furthermore, sexually assaulted her.  Stone testified that she thought Petitioner was going to kill her.  Dr. Deason testified that the results of his examination of Deasha Stone were consistent with her account of events.

19

Viewing this evidence in a light most favorable to the prosecution, and according the benefit of all reasonable inferences to the prosecution, a reasonable juror could certainly have found Petitioner guilty beyond a reasonable doubt of assault with the intent to commit great bodily harm less than murder. Accordingly, the trial court did not err by denying Petitioner's motion for directed verdict and submitting this charge to the jury. *See Johnson v. Hofbauer*, 159 F.Supp.2d 582, 596-97 (E.D. Mich. 2001) (recognizing that where the evidence would support a conviction on a particular charge, it does not constitute error to submit the resolution of such charge to the jury).

The Michigan Court of Appeals found this particular claim to be without merit. *People v. Stone*, No. 246344, Opinion at 1-2 (Mich. Ct. App., April 22, 2004). In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.


**II.          Substitution of Counsel Claim**

Petitioner's trial began on October 21, 2002, at approximately 9:40 a.m. (Trial Transcript, Oct. 21, 2002, 4). Jury selection began approximately eight minutes later. (Tr. 5). Later that morning, before the completion of jury selection, Petitioner informed the court that he wanted to fire his attorney. (Tr. 71). Finding that Petitioner had failed to establish good cause therefor, the court denied Petitioner's request for replacement counsel. (Tr. 71-73). Following the testimony of Deputy Shipman and Deputy Brooks, Petitioner moved the court for a seven day continuance to permit him to obtain different representation. (Tr. 148). Finding that it was "not reasonable to

recess the trial for a week at this point," Petitioner's request was again denied.  (Tr. 148-49).
Petitioner argues that the trial court's refusal to permit him to obtain substitute counsel deprived him
of his Sixth Amendment right to counsel.

        The Sixth Amendment to the United States Constitution provides that, [i]n all
criminal prosecutions, the accused shall enjoy the right to. . .the Assistance of Counsel for his
defence."  U.S. Const. amend. VI.  While an "essential" element of this right is the right to be
represented by "counsel of one's choice," the right to be represented by chosen counsel "is not
absolute."  *United States v. Mooneyham*, 473 F.3d 280, 291 (6th Cir. 2007) (citing *United States v.
Gonzales-Lopez*, - - - U.S. - - -, 126 S.Ct. 2557, 2561 (2006)).

        When considering a defendant's request to obtain substitute counsel, courts must
consider the following factors: (1) timeliness of the request; (2) adequacy of the court's inquiry into
the defendant's complaint; and (3) whether the alleged conflict between defendant and counsel is
so great that it results in "a total lack of communication preventing an adequate defense."
*Mooneyham*, 473 F.3d at 291.  The court must balance the defendant's right to counsel of his choice
with the public's interest in the prompt and efficient administration of justice.  *Id.*  Moreover, trial
courts are permitted "broad discretion" when considering a request for a continuance to obtain
substitute counsel.  *Morris v. Slappy*, 461 U.S. 1, 11 (1983).  In this respect, "only an unreasoning
and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay" violates
the Sixth Amendment.  *Id.* at 11-12.

        An examination of these factors reveals that Petitioner's Sixth Amendment rights
were not violated.  Petitioner did not make his request for substitute counsel until after the outset
of trial.  The trial court questioned Petitioner regarding the basis for his request.  There is no

21

evidence in the record that there existed between Petitioner and his attorney "a total lack of communication preventing an adequate defense." In fact, the record records several instances in which the proceedings were delayed so that Petitioner could consult with his attorney. (Trial Transcript, Oct. 21, 2002, 164; Trial Transcript, Oct. 22, 2002, 23, 45). Finally, as the Michigan Court of Appeals correctly observed, Petitioner's counsel "presented a cogent and vigorous defense." *People v. Stone*, No. 246344, Opinion at 2 (Mich. Ct. App., April 22, 2004).

The Michigan Court of Appeals found that Petitioner was not deprived of his Sixth Amendment right to counsel. *Id.* at 2. In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## III.           Ineffective Assistance of Counsel Claims

Petitioner asserts that his trial counsel improperly failed to question his wife regarding allegedly false accusations she had previously asserted against her first husband, Rodney DeMyers. Petitioner also asserts that his attorney "made statements during closing arguments that amounted to the functional equivalent of a guilty plea." Petitioner argues that as a result of counsel's performance he was denied his Sixth Amendment right to the effective assistance of counsel.

To establish that he was denied the right to the effective assistance of counsel, Petitioner must establish that his counsel's performance was so deficient that he was not functioning

as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Accordingly, it must be demonstrated that counsel's actions were unreasonable under prevailing professional norms. *Id.* at 688. In making this determination, however, the Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [Petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689.

Petitioner must further establish that his attorney's performance was prejudicial in that it denied him a fair trial. *Id.* at 687. This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (*en banc*), *cert. denied*, 113 S. Ct. 2969 (1993) (emphasis in original).

### A.    Questioning of Rodney DeMyers

At the outset of the second day of trial, outside the presence of the jury, Petitioner's counsel indicated that he wished to question DeMyers concerning "a number of false charges" that Deasha Stone allegedly asserted against DeMyers, as well as other incidents which Petitioner felt reflected poorly on Deasha Stone's character. (Trial Transcript, Oct. 22, 2002, 8-9). The prosecutor objected to this testimony on several grounds. (Tr. 9-10). The trial court resolved the matter thusly:

> Court:    All right. Thank you. I'm going to allow his testimony if it is limited to his opinion regarding Deasha Stone's truthfulness. I'm not going to allow evidence of any specific instances of conduct as contemplated by 608(B). So him saying that she made false charges against him, would be, in my mind, a specific instance of conduct and would not be

allowed.

With respect to her habits with regarding prescription medication, I don't see how he'd have foundation for that. It's really not relevant, in any event, if it happened in the past.

Likewise, with respect to his opinion regarding her temper, it seems to me that that's character evidence not admissible under 404(B).

Does that give you some guidance, Mr. Davis?

Counsel:   It does, your Honor. For clarification, then, I would like to lay a foundation as to how he knew her, how long he knew her, what their relationship was, and then I'll jump right from there to his opinion.

Court:   I don't have any problem with that.

(Tr. 11-12).

As noted above, Petitioner's counsel questioned DeMyers within the confines of the trial court's evidentiary ruling. Petitioner nonetheless faults his attorney for failing to question DeMyers about matters which the trial court expressly forbade counsel from exploring. Such can hardly constitute ineffective assistance. Moreover, even if counsel's performance in this regard were somehow deficient in this regard, Petitioner cannot demonstrate that he was prejudiced thereby.

Petitioner offers no evidence concerning the allegedly false charges that Deasha Stone allegedly asserted against DeMyers. Petitioner offers no evidence concerning the other alleged incidents involving Deasha Stone about which DeMyers would have allegedly testified. Finally, Petitioner has presented no evidence that DeMyers would have presented favorable

24

testimony concerning these matters.  Thus, Petitioner cannot demonstrate that the outcome of this matter would have been different even had his attorney questioned DeMyers about such matters. Considering that the evidence of Petitioner's guilt was substantial, the Court finds it unreasonable to argue that the responses to such questions would have resulted in a different outcome.

      B.      Closing Argument

In his closing argument, Petitioner's counsel made the following two comments which Petitioner asserts constituted ineffective assistance of counsel:

> 1.    Now, I'm not here to tell you you ought to come in with a not guilty verdict.  You ought to come in with a guilty verdict.

> 2.    Again, I'm not here to argue to you and I'm not arguing to you that he's not guilty.  He is guilty.

(Trial Transcript, Oct. 22, 2002, 82-83).

As the Michigan Court of Appeals correctly observed, Petitioner's argument "takes defense counsel's statements out of context."  *People v. Stone,* No. 246344, Opinion at 4 (Mich. Ct. App., April 22, 2004).  When assessed in context (including the evidence presented at trial), counsel's argument to the jury constituted legitimate (and successful) trial strategy.

At the outset of his closing argument, counsel made the first comment quoted above. (Trial Transcript, Oct. 22, 2002, 82).  Counsel then talked about the fact that in addition to receiving instructions on the two crimes with which Petitioner had been charged (first degree criminal sexual conduct and assault with intent to do great bodily harm less than murder), they would also be instructed about other "included offenses."  (Tr. 82).  Counsel then urged the jury to consider all the

25

evidence and evaluate whether the prosecution had demonstrated beyond a reasonable doubt that Petitioner was guilty of the primary charges or whether the evidence instead supported finding Petitioner guilty of a lesser included offense.  (Tr. 82).  It was at this point that counsel made the second comment to which Petitioner objects.  (Tr. 82-83).  To understand counsel's strategy, however, and to properly assess this particular statement it must be considered in its entirety:

> Again, I'm not here to argue to you and I'm not arguing to you that he's not guilty. He is guilty. This is completely inappropriate. This is a man who thinks his wife's been running around on him, that she spent her week in Muskegon with his kid with another man, who had been drinking out of control, he's in the wrong. The only question is how much is he in the wrong. And that of course is what you're going to decide.

(Tr. 82-83).

Counsel then engaged in an exhaustive and lengthy examination of the evidence, arguing that Petitioner was not guilty of the principle crimes with which he had been charged, but was instead guilty at most of a lesser included offense.  (Tr. 83-90).  Specifically, counsel argued that Deasha Stone was not a credible witness.  (Tr. 83-89).  Counsel argued that her injuries were inconsistent with her allegations.  (Tr. 83-88).  He noted that Deasha Stone's first husband testified that Stone was not a truthful person.  (Tr. 86-87).  Counsel argued that while Petitioner initially denied assaulting his wife, he subsequently provided a statement in which he acknowledged his actions, thus bolstering his credibility.  (Tr. 84-86).  As for whether Petitioner acted with the specific intent to inflict great injury on his wife, counsel argued that given Petitioner's size and strength that had he really wanted to maim or injure Deasha Stone he could and would have.  (Tr. 87-88).

Considering the substantial evidence of Petitioner's guilt, including Petitioner's testimony that he did, in fact, assault his wife and his inability to recall whether (or to what extent)

he sexually assaulted his wife, counsel's argument to the jury constituted a legitimate strategic decision. *See, e.g., Underwood v. Clark*, 939 F.2d 473, 474 (7th Cir. 1991) (where the evidence of guilt on a lesser charge is overwhelming, acknowledging guilt as to such constitutes a "sound tactic" as "there is an advantage to be gained by winning the confidence of the jury"); *Lingar v. Bowersox*, 176 F.3d 453, 459 (8th Cir. 1999) (same); *Johnson v. Warren*, 344 F.Supp.2d 1081, 1095 (E.D. Mich. 2004) (same); *Poindexter v. Mitchell*, 454 F.3d 564, 582 (6th Cir. 2006) (same). The Court notes that counsel's strategy was partially successful, as the jury acquitted Petitioner on the charge of assault with the intent to commit great bodily harm less than murder.

The Michigan Court of Appeals found Petitioner's claims of ineffective assistance to be without merit. *People v. Stone,* No. 246344, Opinion at 2-4 (Mich. Ct. App., April 22, 2004). In light of the authority herein identified, the Court concludes that the decision of the Michigan Court of Appeals is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, its decision was not based on an unreasonable determination of the facts in light of the evidence presented. As such, this claim presents no issue on which habeas corpus relief may be granted.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Stone's petition for writ of habeas corpus be **denied**.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure

to file objections within the specified time waives the right to appeal the District Court's order.

*Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date:  January 9, 2009                    /s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge

28